UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

RENE GALVAN, JR.,                         )
                                          )
                    Plaintiff,            )
                                          )
          v.                              )        No. 1:19-cv-04446-SEB-MG
                                          )
STATE OF INDIANA, et al.                  )
                                          )
                    Defendants.           )

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendants' Motion for Summary Judgment

[Dkt. 57].  Plaintiff Rene Galvan, Jr. brings this action against his former employer

Defendant State of Indiana (the "State") and his supervisor Defendant Joanie R. Crum, in

her official and individual capacities, alleging that he was discriminated against and

terminated based on his race (Hispanic) and sex (male), and subjected to retaliation based

on his complaints of discrimination, all in violation of Title VII of the Civil Rights Act of

1964 ("Title VII"), and that Ms. Crum denied his Fourteenth Amendment rights by

terminating him without just cause and depriving him of his property rights without due

process, in violation of 42 U.S.C. § 1983.  Defendants deny these allegations.

## Factual Background

### General Background

Mr. Galvan was hired in late 2012 by the State's Department of Child Services

("DCS") as a Family Case Manager ("FCM") in the Hamilton County office.  As an

1

FCM, Mr. Galvan was responsible for managing the cases he was assigned but had no supervisory responsibilities.  In 2015, at the request of a supervisor, Mr. Galvan voluntarily transferred to DCS's larger Madison County office where he was later promoted to Family Case Manager Supervisor ("FCMS").  As an FCMS, Mr. Galvan was responsible for supervising a team of FCMs.  He was directly supervised in that role by the Local Office Director of Madison County, who, in turn, was supervised by the Regional Manager of Region 11, which territory includes Hamilton, Madison, Tipton, and Hancock Counties.

**Plaintiff's 2012–2016 Appraisal Reports**

In each of his appraisal reports issued from 2012 through 2016, Mr. Galvan received "meets" or "exceeds" expectations ratings in every assessed category.  He received particularly high praise for his teamwork and his willingness to assist his coworkers in various ways, including, "on calls, being extra hands during a removal, or being a translator for Spanish-speaking families, when safety needs to be assured or when emergencies arise."  Dkt. 59-1 at 123.  His reviews also noted that he "identified when co-workers … struggled and … assisted in supporting them through difficult times."  *Id.*

Mr. Galvan did, however, receive feedback from various supervisors throughout this period describing him as a "jokester" who tended to make light of situations to such an extent that his coworkers and subordinates could not always discern whether he was taking their concerns seriously and whether they should take seriously his input on decisionmaking.  Mr. Galvan was advised to focus on his demeanor and on improving his communication skills.  After concerns were raised in early appraisal reports regarding

2

Mr. Galvan's tendency to "ask for guidance from all the supervisors instead of following the advice of the first supervisor response" and to "show and state visible frustrations … in unprofessional ways" when he "disagreed with management directives," Mr. Galvan admitted that he was dubbed the "why guy" by his co-workers because of his tendency always to ask management "[w]hy are we doing this?"  Galvan Dep. at 58.  Mr. Galvan testified that he posed such questions not to be defiant but only to clarify and understand the expectations, though he believed management did not always welcome his questions. He never received formal discipline based on any of this conduct, however.

**Turnover in DCS Supervisory Staff**

At the end of 2016, Dan Brumfield, who at that point had served as the Regional Manager of Region 11 throughout Mr. Galvan's entire tenure with DCS, left State employment for other employment.  DCS did not immediately replace him; thus, during the first few months of 2017 no one filled the position of full-time Region 11 Manager. In April 2017, DCS promoted Defendant Joannie Crum, a white female who was serving as the Local Office Director for Montgomery County at the time to the Regional Manager position previously vacated by Mr. Brumfield.  In July 2017, shortly after Ms. Crum took over as Regional Manager, Madison County's Local Office Director, Karen Blessinger, who had been Mr. Galvan's direct supervisor, left the Madison County office.

Following Ms. Blessinger's departure, at Ms. Crum's request, in addition to their regular duties Hamilton County Local Office Director Christi Tucker-Beebe and Tipton County Local Office Director Lyndsay Krauter performed the duties of the Madison County Local Office Director until December 2017 when Ms. Crum promoted Kathryn

Heman, a white female peer of Mr. Galvan's, to fill the full-time role of Local Office Director of Madison County.

**Hispanic Outreach Meetings**

When Ms. Crum was promoted to Regional Manager, Mr. Galvan had for some time been representing DCS at a Hispanic community outreach program with the Anderson Police Department by attending the meetings to provide advice to Hispanic families regarding DCS's services.  According to Mr. Galvan, he was the only Hispanic DCS employee who spoke fluent Spanish and "had a lot in common with that community."  Galvan Dep. at 201.  Although no complaints had been received regarding Mr. Galvan's representation of DCS at these meetings, shortly after Ms. Crum was promoted to Regional Manager and before Ms. Heman was promoted to Madison County's Local Office Director, Ms. Crum informed Mr. Galvan that she did not want him to attend those meetings alone, prompting her to assign Ms. Heman, a white woman who had studied Spanish in college, to attend with him.

Ms. Heman attended one such meeting with Mr. Galvan but did not speak publicly; she "just sat there and just watched and just sat in a corner and kind of never interacted with anyone." *Id.* at 202.  Following that meeting, Mr. Galvan maintains, he was asked by either Hispanic community members or the Anderson Police Department, it is not clear which, to no longer bring Ms. Heman to meetings because "it made the people feel uncomfortable." *Id.*  When Mr. Galvan communicated that request to Ms. Crum she said that if he wanted to attend the community meeting "you're going to take Ms. Heman." *Id.*  Mr. Galvan informed the coordinator of the outreach program who

4

worked for the Anderson Police Department that Ms. Heman would continue attending future meetings with him; in response he was told "if she's coming with you, we're just not going to ask DCS to represent [itself] in these community meetings."  *Id.*

**Plaintiff's August 2017 Interim Appraisal Report**

In his first review after Ms. Crum took over as Regional Manager, Mr. Galvan again received "meets expectations" ratings in all the assessed categories on his August 2017 appraisal report, which had actually been completed by Ms. Blessinger before her departure in July 2017.  In the "Customer Service" section, it was noted that Mr. Galvan had "really started to show growth in recognizing other perspectives and being empathetic to where others are coming from" and that there had not been "any concerns in the area of customer service."  Dkt. 59-1 at 154.  In the "Employee Relations" section, the report stated that Mr. Galvan is "fair and objective with his employees" and "establishes a good work atmosphere for his unit."  *Id.* at 155.  That section further noted that Mr. Galvan "is aware that he has a strong personality that can, at first, put people off," but that, although "[h]e is directive in his personality, … his workers know that he will support them as long as they are acting within DCS policy."  *Id.*

**Plaintiff's Alleged Performance Issues in the Latter Half of 2017**

According to Mr. Galvan, after Ms. Crum was promoted to Regional Director and assigned Ms. Tucker-Beebe and Ms. Krauter interim responsibilities rather than hire a full-time employee to fill the Madison County Local Office Director position, the Madison County FCMSs received less guidance and support from their supervisory staff creating uncertainty with regard to protocols related to several issues, including policies

regarding leaving the office and participating in community events.  Because Mr. Galvan had previously worked with Ms. Tucker-Beebe in Hamilton County, he was chosen by the other FCMSs to reach out to her for clarification of these policies, which he did. When certain of these supervisors were unhappy with Ms. Tucker-Beebe's response, Mr. Galvan returned to her for further clarification.  Following this second exchange, Ms. Crum advised Mr. Galvan not to consult Ms. Tucker-Beebe in that fashion again because it could be viewed as defiant and insubordinate behavior on his part.

On another occasion, Mr. Galvan reportedly attended a community stakeholder meeting as a representative of DCS to request clarification of a report that was required regarding suspected drug use in the family when drugs screens for all family members had come back negative.  A doctor in attendance provided an answer to the question and Mr. Galvan said nothing further about the matter.  Following the meeting, Ms. Crum approached Mr. Galvan to convey a concern voiced by the central DCS office that he had directed a doctor not to report concerns regarding family drug abuse when there were no positive drug screens.  Mr. Galvan denied having made that statement, explaining that he was merely seeking guidance and clarification regarding what to do in such a situation. Ms. Crum advised him to consult her in the future before making a public inquiry regarding such a sensitive issue so that a response could be crafted in advance.  No formal discipline was issued to Mr. Galvan.

During the fall of 2017, Ms. Crum spoke with Mr. Galvan after receiving a report that he had caused another employee to cry when she called the DCS hotline to make a report of suspected child abuse and neglect.  Typically, reports made on the hotline are

6

considered "24-hour" reports, meaning that DCS has 24 hours to respond.  According to

Mr. Galvan, pursuant to DCS policies and procedures, calls on the hotline for 24-hour

reports are supposed to cease at 9:00 p.m. each night and only those calls conveying

"one-hour" reports, which are emergencies to which DCS must respond within one hour,

are supposed to be made after 9:00 p.m.  Galvan Dep. at 43.  Mr. Galvan claims that the

call at issue, however, came in at 1:00 or 2:00 a.m., even though it was a standard 24-

hour report and not an emergency.  Because the caller was laughing when she called in,

Mr. Galvan asked her "why she was chuckling," and further inquired as to why she was

calling so late with a non-emergency report.  *Id.*  The caller initially responded that her

supervisor directed her to make the call, but when asked to name the supervisor, she

identified the person as her co-worker.  *Id.* at 43–44.  Mr. Galvan then stated: "[T]his is

kind of ridiculous that you're calling me and laughing thinking it's a joke, calling me,

waking me up this late at night when it's not an emergency, and per policy and

procedures, this needs to be an emergency if you're calling me this late at night."  *Id.* at

44.

Following this exchange, the caller reported to her direct supervisor that Mr.

Galvan had caused her to cry because she thought she had done something wrong.  After

Ms. Crum learned of the incident, she approached Mr. Galvan about it and Mr. Galvan

explained that he believed the caller *had* done something wrong by failing to follow

policy and that he did nothing improper by telling her so.  Mr. Galvan emphasized that he

had still received her report and had not been rude, yelled, or hung up on her.  Based on

Mr. Galvan's description of the incident, Ms. Crum agreed that the caller had violated

DCS policy by calling in so late to make a report when it was not an emergency.  Galvan

Aff. ¶ 119.  Ms. Crum promised to listen to the recording of the call and follow up with

Mr. Galvan, but Mr. Galvan reports that she never did.  Because he was never disciplined

for the incident, he believed the situation had been resolved.  *Id.* ¶ 121; Galvan Dep. at

44–45.

**2017 End-of-Year Appraisal Report**

   On his 2017 end-of-year appraisal report, for the first time ever during his tenure

with DCS, Mr. Galvan received a "Needs Improvement" overall rating as well as a "Does

Not Meet" expectations rating in the categories of "Customer Service" and "Employee

Relations."  Prior to this report, he had never received any formal discipline or been told

that his job performance was unsatisfactory, which lack of forewarning Mr. Galvan

claims was against DCS policy.  The report noted that DCS had received complaints

during the review period regarding Mr. Galvan's behavior from "both internal and

external stakeholders." Exh. H to Galvan Dep. at 2.  Specifically, "two complaints were

received that [Mr. Galvan] displayed challenging and verbally aggressive behavior with

stakeholders during a community meeting" and that he "also has displayed inappropriate

responses when directing a subordinate.  He was loud and verbalized publicly his

frustration with a staff member."  *Id.*  With regard to "Employee Relations," the report

concluded that Mr. Galvan "was ineffective in establishing and maintaining a cordial and

harmonious work environment at times," "displayed difficulty communicating with peers,

subordinates and managers," and was "verbally aggressive."  *Id.* at 4.

Ms. Crum sent an initial draft of this performance appraisal to her supervisor, Deputy Director Gilbert Smith, informing Mr. Smith that Mr. Galvan was the only manager or supervisor receiving a "Needs Improvement" rating.  In response, Mr. Smith suggested that Ms. Crum review the comments she had written under the "Teamwork" section stating that Mr. Galvan was "very willing to accept feedback," but elsewhere in the same paragraph she had written that he was "not open to feedback."  Dkt. 74-5.  In response, Ms. Crum removed the first sentence from her assessment, explaining to Mr. Gilbert that she was "trying to say that he respectfully listens and accepts the feedback, he even generally agrees with what you say, he just doesn't change his behavior."  *Id.*

Ms. Crum's final appraisal was presented to Mr. Galvan in February 2018 and signed by her as the evaluator.  Mr. Galvan refused to sign the document because he disagreed with the assessment and believed it was against DCS policy to give a "Needs Improvement" rating when the employee had never been disciplined.  Despite the "Needs Improvement" rating, Ms. Crum informed Mr. Smith that the appraisal report did "not warrant a WIP or plan," but that, if he thought otherwise, she was open to his suggestion. *Id.* So far as we know, Mr. Galvan was never placed on a work improvement plan following the issuance of this appraisal.

**Plaintiff Contacts Human Resources and Receives Written Counseling**

On February 18, 2018, Mr. Galvan contacted Jenny Cable with DCS's Human Resources ("HR") Department seeking information regarding the process to appeal his annual appraisal.  He also expressed concern regarding possible retaliation if he were to

file an official complaint.  Dkt. 74-7.  Ms. Cable provided him information regarding the procedures for formally appealing his evaluation.

Thereafter, Mr. Galvan met with Ms. Crum regarding his appraisal, and, on March 1, 2018, he contacted HR by email to report his intention to appeal by filing a civil service complaint.  In that same email, he again expressed his concern regarding retaliation.  Ms. Cable provided instructions regarding the procedures for filing a complaint and assured Mr. Galvan that DCS had safeguards in place to prevent retaliation and that he should contact her as soon as possible if he came to believe he was being subjected to retaliation.  Dkt. 74-8.

Less than two weeks later, on March 12, 2018, Mr. Galvan received a written counseling citation for having failed to ensure that an FCM under his supervision had completed a timely safety plan for a child.  Exh. J to Galvan Dep.  Mr. Galvan had authorized the FCM in question "not to complete a safety plan with the family as the worker was tired and had been out for a long time" and the FCM neglected to remember to write a safety plan only after she and the family members had all left the hospital in the middle of the night.  Because it would be difficult at that time to locate the family and because the FCM had assured Mr. Galvan that "the pediatricians had not expressed any concerns with the [infant's] injury and [the family's] explanation," *id.*, Mr. Galvan believed it was acceptable to wait until the following morning to complete a safety plan. In addition, DCS did not at that time have any policy requiring safety plans or imposing a schedule for the completion of such plans.  Galvan Aff. ¶¶ 166–67.

The written counseling citation issued by Mr. Galvan's supervisor does not square with what Mr. Galvan contends the FCM told him that evening. According to the written counseling form, Mr. Galvan's direct supervisor, Ms. Heman, spoke with a pediatrician at the hospital "who expressed imminent concerns in regards to the injury and explanation, and the lack of safety planning" and "explained the concern was expressed at the time of release." Exh. J to Galvan Dep. Mr. Galvan was therefore counseled to "review Chapter 4 in policy … and implement a process to ensure assessments are thoroughly initiated and children are safe before the FCM leaves the assessment location." *Id.* Mr. Galvan has testified that at the time he received this discipline he was informed that DCS policy was changing such that the following week safety plans would be mandatory each time DCS became involved in a case, but Ms. Heman could not explain the reason he was being disciplined before the policy change was implemented. According to Mr. Galvan, Ms. Heman admitted that other FCMSs whose FCMs had not completed safety plans were not being counseled. Galvan Aff. ¶¶ 166–168. This is the first written counseling Mr. Galvan received during his tenure with DCS. Galvan Dep. at 88.

A few weeks thereafter, on March 29, 2018, Mr. Galvan requested that Ms. Cable retract his civil service complaint because he preferred to address the situation personally as he did "not believe anything will change" and could "get worse if [he] move[d] forward" with his complaint. Dkt. 74-10.

**Plaintiff's Complaints of Discrimination**

Mr. Galvan has testified that "maybe around mid-2018" and "[b]etween June and August 2018" he spoke with Ms. Heman and Ms. Crum on separate occasions when he

"brought up that [he] believed that [he] was being treated differently and [he] was being discriminated against."  Galvan Dep. at 199; Galvan Aff. ¶ 204.  Specifically, he said that he had noticed that Ms. Heman never disciplined female FCMSs who did not answer their phones, respond to emails, or follow directives, and had also failed to discipline the female supervisor of an FCM under whose watch a child died, but issued unwarranted discipline to him when nothing he had ever done caused a serious safety issue.  Galvan Aff. ¶¶ 88–89.  He told Ms. Heman and Ms. Crum that he believed the only reason that they were holding him more closely accountable compared to his peers was "because [he is] Mexican" and "a big guy, scary looking, according to people."  Galvan Dep. at 199, 200; *accord* Galvan Aff. ¶ 205.  According to Mr. Galvan, neither Ms. Heman nor Ms. Crum specifically denied his allegations, and neither took any action in response to his claims of discrimination.

**2018 Interim Appraisal Report**

Mr. Galvan's August 31, 2018 interim appraisal report was prepared by Ms. Heman, who had taken over in January of that year as the Madison County Local Office Director.  After receiving his 2017 end-of-year report reflecting "Needs Improvement" and "Does Not Meet expectations," his ratings in the "Customer Service" and "Employee Relations" sections of the 2018 interim appraisal report including his overall rating returned to "Meets" expectations.  Specifically, in the "Customer Service" section of the report, it states that while Mr. Galvan "previously had difficulty with customer service in the past," over the current reporting period he succeeded in taking "advice on customer service to not come across as aggressive or demanding in oral or written conversation"

and "promptly address[ing] [] issue[s], whether it be with a worker or a peer on the management team."  Exh. I at 2.

In the "Employee Relations" section, Ms. Heman wrote that Mr. Galvan "is very supportive with his unit" and "takes time to get to know his unit through team activities and planned unit activities outside of the office."  *Id.* at 3.  She further noted that Mr. Galvan "treats everyone in the office equally and fairly and does not show favoritism" and "[i]f any issue arises between him and another worker, [he] is quick to address the issue so that it does not linger."  *Id.*  He is also "quick to make amends and admit when he needs to improve."  *Id.*

**Plaintiff's Written Reprimand and Complaint from Subordinate**

Approximately one month later, on September 26, 2018, Mr. Galvan received a written reprimand for directing an FCM under his supervision to "unsubstantiate" domestic violence allegations in connection with an incident that occurred on September 18, 2018.  Exh. K to Galvan Dep.  Following a review conducted by another FCMS, DCS determined that it was necessary to remove the children from the home because there was a child under the age of eighteen months in the home.  The reprimand recited that "Mr. Galvan's judgment in regards to child safety is concerning" and that he "failed to use critical thinking and good judgment when guiding the FCM through the assessment regarding the safety of the children."  *Id.*

In addition, the written reprimand referenced other concerns brought to the attention of the Local Office Director that Mr. Galvan "used negative statements towards staff" and "failed to address concerns of an FCM's work in a professional manner" by

13

addressing the concerns of one of his FCMs "in a group, rather than in a 1:1 setting." *Id.*

When questioned about this complaint, Mr. Galvan "admitted he did not have time to

'baby' staff and it seemed they had been 'babied' by their supervisor." *Id.*

On October 30, 2018, Kristin Nigg, an FCM whom Mr. Galvan had been

supervising on a temporary basis complained to Ms. Heman via email about his

supervision, stating that, at a unit breakfast on October 19, 2018 which she attended with

Mr. Galvan's team, she was made to feel "very uncomfortable" because the meeting

"entailed making fun of coworkers in which [she] did not want to take part." Exh. L to

Galvan Dep.

In that same email, Ms. Nigg also complained regarding an incident that occurred

on October 25, 2018 when she felt she did not receive adequate support from Mr. Galvan

after she called him for advice while completing a placement in the field. Ms. Nigg

reported that even though Mr. Galvan was still in the office at the time she called he

failed to assist her and told her instead that they would discuss the issue the following

day. According to Ms. Nigg, after expressing concern on the following day regarding

having to wait to receive advice, Mr. Galvan responded that she "was stressed" and "was

relaying to him that [she] would not be able to handle things after 4:30 and [her]

assessments or detentions would start going to on-call." *Id.*

The email also recounted that on October 29, 2018 Ms. Nigg and a colleague,

Elise Wilson, who were conducting an assessment at a residence, which necessitated Ms.

Nigg's stepping away to call Mr. Galvan, thereby leaving Ms. Wilson alone in the room

with the clients. According to Ms. Nigg's account, Mr. Galvan criticized her so loudly

for having a discussion with him in front of the clients, that Ms. Wilson could hear his voice through the phone into the other room.  When Ms. Nigg tried to explain that she was not calling him in front of the clients, she "was dismissed by [Mr. Galvan] and he was adamant [she] was in front of the family."  *Id.*

**DCS's Decision to Remove Children from Home Reversed by Court**

As mentioned previously, in September 2018, DCS reversed Mr. Galvan's "unsubstantiated" finding and removed client children from their family following an alleged domestic violence incident.  The family of the children whom DCS had removed ultimately appealed that decision to state court.  Mr. Galvan states that the presiding state court judge ordered DCS to close the case after determining in November 2018, in a decision in line with Mr. Galvan's initial recommendation, that the children should not have been removed from the home.  Defendants have not represented otherwise.

On November 8, 2018, upon learning of this judicial decision, Mr. Galvan approached Ms. Crum (his direct supervisor, Ms. Heman, had resigned from her position with DCS by that time) to request that the reprimand he had previously received be removed from his record, since the judge's decision agreed with his original assessment. Mr. Galvan informed Ms. Crum that he had been told by the FCM who had been assigned to that case that Ms. Heman and another FCMS had caused the FCM to falsify the report to say that a child under eighteen months was present during the September 2018 assessment, which was not true.  Ms. Crum responded to Mr. Galvan that they would discuss these issues later, informing Mr. Galvan for the first time that she needed to meet

with him later that same day for a pre-deprivation hearing and that he needed to find a witness to attend with him.  Galvan Dep. at 107.

**Plaintiff's Pre-Deprivation Hearing and Termination**

Upon learning that he must attend a pre-deprivation hearing that same day, Mr. Galvan asked Zachary Coffman, another supervisor in the Madison County office, to serve as his witness.  Mr. Galvan, Mr. Coffman, and Ms. Crum were all present at the hearing as well as the interim Local Office Director, Ms. Crumbaugh.  The subject of the hearing was the complaint filed against Mr. Galvan by Ms. Nigg.  Mr. Galvan spoke on his own behalf at the hearing and explained his version of his interactions with Ms. Nigg: to wit, that he had provided her adequate support by sending more experienced FCMs to accompany and assist her on her detentions and assessments and that, despite making several requests, Ms. Nigg never completed the necessary paperwork or safety plans for the locations she visited, even though he had assigned other FCMs to help her complete the documents and he repeatedly asked to see them.  He told Ms. Crum that he was notified only after she did not report to him for a few days that he would no longer be supervising Ms. Nigg but was given no explanation for his removal.  Galvan Aff. ¶ 302. Mr. Galvan also denied Ms. Nigg's allegation that he had yelled at her over the phone; he told Ms. Crum that he had simply told Ms. Nigg not to call and speak with him in the presence of the family.  *Id.* ¶¶ 296–298.  After the hearing was completed, Mr. Galvan returned to his office as instructed.

After the meeting, Ms. Crum called her supervisor, Rhonda Allen, to discuss what had occurred, followed by a second call to HR generalist Natalie Broadus-Beard, who

recommended Mr. Galvan's termination.  Ms. Crum conveyed Ms. Broadus-Beard's recommendation to Ms. Allen, with which Ms. Allen agreed.  A few hours later, around 5:00 or 6:00 p.m., Ms. Crum and Ms. Crumbaugh visited Mr. Galvan in his office to inform him that the decision had been made to terminate him for the reasons set forth in the termination letter they delivered to him.  The termination letter provided that Mr. Galvan was being terminated because he had failed to provide "appropriate supervision to an employee in the field nor did [he] provide appropriate oversight and guidance around safety planning," and failed to "follow procedure regarding safety staffing or review safety plans created by the FCM regarding assessment."  Dkt. 59-195.  The letter also stated that such conduct violated the agency code of conduct and agency policies 4.18, 4.19, and 4.41.  *Id.*  Upon receiving this notice, Mr. Galvan packed up his belongings and was asked to leave the premises.  Galvan Dep. at 170.

**Plaintiff's Attempts to Transfer to Hamilton County**

Throughout his tenure with DCS, Mr. Galvan made several attempts to transfer out of the Madison County office in order to return to Hamilton County, which was where he and his family resided.  The first time he requested a transfer to Hamilton County was in late June 2017, approximately a year and a half following his transfer to Madison County. This request to transfer reflected that both supervisors who had previously requested his assignment to Madison County—Ms. Blessinger and Mr. Brumfield—had departed DCS or would soon be leaving the Madison County office.  Galvan Dep. at 118–19.

Mr. Galvan was interviewed for the Hamilton County position by Ms. Tucker-Beebe but ultimately was not selected for the transfer.  One of his co-workers in the

Madison County office, Jennalee Albee, who had an additional year of supervisory experience albeit no experience in the Hamilton County office, was selected for the position. *Id.* at 119–21. When Ms. Albee eventually resigned from the Hamilton County position a few months later, on January 5, 2018, Mr. Galvan reapplied for a transfer, was interviewed by Ms. Tucker-Beebe and possibly Ms. Heman, but once again not selected for the position. Marshall Despain, a caseworker in the Hamilton County office, was selected for promotion to the managerial position. *Id.* at 126–128. Mr. Despain had been hired as an FCM approximately eighteen months prior to Mr. Galvan's hire-on date but had no supervisory experience. Galvan Aff. ¶ 81. Based on their work together in Hamilton County, Mr. Galvan described Mr. Despain as very disorganized and not someone others consulted for guidance, which in his opinion made Mr. Despain a weak choice. *Id.* ¶ 82.

On March 19, 2018, Mr. Galvan again applied for a transfer to Hamilton County. *Id.* ¶ 184. He again interviewed with Ms. Tucker-Beebe and again was not selected for the position. Britney Hickerson, a caseworker in the Hamilton County office, was promoted to fill the role. Ms. Hickerson's seniority with DCS exceeded Mr. Galvan's by approximately one year and nine months, but she had no experience as a supervisor. *Id.* ¶ 186.

Mr. Galvan applied for a transfer in Hamilton County a fourth and final time on September 17, 2018, was interviewed for the opening on September 27, 2018 again by Ms. Tucker-Beebe and Ms. Heman, but not selected. Kaneishia Tinker, a caseworker in the Madison County office, who had been hired by DCS approximately eighteen months

after Mr. Galvan and had no supervisory experience, was selected for the position. Galvan Dep. at 132–34.

The record before us does not identify which member(s) of DCS management were/was ultimately responsible for making these transfer decisions to Hamilton County. Ms. Crum testified that she had informed Mr. Galvan when he asked for assistance in transferring to Hamilton Count that she did not "have the power to make another region or somebody take him in as a transfer ….," (Crum Dep. at 44), but Mr. Galvan has testified that Ms. Crum did possess approval authority for all transfers within Region 11. Galvan Aff. ¶ 85.

**The Instant Litigation**

Mr. Galvan filed his complaint in this lawsuit on November 4, 2019, after receiving from the EEOC his notice of right to sue letter on August 7, 2019.  He amended his complaint on January 17, 2020, alleging discrimination and retaliation claims under Title VII as well as a Fourteenth Amendment due process claim against Ms. Crum. Defendants moved for summary judgment on these claims on March 5, 2021, which motion is now fully briefed and ripe for ruling.

## <u>Legal Analysis</u>

### I.    Summary Judgment Standard

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the

nonmovant on the basis of the designated admissible evidence.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant.  *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

## II.    Discussion

Plaintiff alleges that Defendants failed on several occasions to transfer him to positions in Hamilton County for which he applied and ultimately terminated him based on his race and sex and in retaliation for his having engaged in protected activity, all in violation of Title VII.[1]  He further alleges that Ms. Crum violated his Fourteenth Amendment rights by terminating him, thereby depriving him of his property rights,

---

[1] It is not clear whether Mr. Galvan seeks to pursue separate Title VII discrimination and/or retaliation claims based on his 2017 negative performance evaluation and/or the written warnings and counseling he received prior to his termination. However, "unfair reprimands or negative performance evaluations, unaccompanied by some tangible job consequence, do not constitute adverse employment actions."  *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 729 (7th Cir. 2001); *accord Lauth v. Covance, Inc.*, 863 F.3d 708, 717 (7th Cir. 2017) (in Title VII retaliation context).  Although the negative review and discipline may have "brought [Mr. Galvan] closer to termination[,] [s]uch a course is not an inevitable consequence of every reprimand."  *Oest v. Ill. Dep't of Corrs.*, 240 F.3d 605, 613 (7th Cir. 2001), *overruled on other grounds by Ortiz*, 834 F.3d at 760.  Because Mr. Galvan has not "pointed to any immediate consequence of the reprimands, such as *ineligibility* for job benefits like promotion, transfer to a favorable location, or an advantageous increase in responsibilities," his receipt of a negative evaluation and written reprimands does not amount to adverse employment actions under Title VII and cannot be relied upon as separate instances of discrimination or retaliation.  *Id.* (emphasis added).  Mr. Galvan's claim that he was subjected to unwarranted discipline prior to his termination and within close time proximity to having complained of protected activity may, however, be relevant evidence to a determination of whether Defendants' decisions to terminate his employment and not select him for transfer to Hamilton County were discriminatory and/or retaliatory.

without just cause and without proper due process.  We address these claims in turn below.

### A.    Title VII Claims

An analysis of Plaintiff's Title VII claims invokes the Seventh Circuit's decision in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), which states that regardless of whether the court uses the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) or some other framework to evaluate a plaintiff's employment discrimination and retaliation claims, "the ultimate legal question 'is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'"  *Reed v. Freedom Mortg. Corp.*, 869 F.3d 543, 547 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 765).  Under this "simplified" approach, the "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence."  *Ortiz*, 834 F.3d at 765.

Here, Mr. Galvan has chosen not to proceed under the *McDonnell Douglas* framework, arguing instead that, in considering the totality of the evidence, a jury could readily conclude that Defendants unlawfully discriminated and retaliated against him in violation of Title VII when they repeatedly failed to transfer him to Hamilton County and ultimately terminated his employment.  We follow his lead and thus address his Title VII claims in the same manner.  *See Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 880 (7th Cir. 2016) (suggesting that the court need not address the *McDonnell*

*Douglas* framework when the plaintiff does not utilize it in response to a summary judgment motion).

### i.    Discriminatory Termination

We turn first to address Mr. Galvan's claims that he was terminated from his employment because of his race and/or sex, in violation of Title VII.  Defendants argue that they are entitled to summary judgment on Plaintiff's Title VII discriminatory termination claim because there is no evidence that Mr. Galvan's termination was based on his race or sex.  Rather, Defendants argue, the adduced evidence establishes that Mr. Galvan had throughout his tenure with DCS exhibited instances of insubordinate behavior which progressively worsened after he became a supervisor, resulting in his receipt of several disciplinary citations related to his supervisory decisions involving child safety.  It was these lapses in judgment by Mr. Galvan, rather than any Title VII prohibited motive by Defendants, that ultimately led to his termination.

Mr. Galvan rejoins that he has adduced sufficient circumstantial evidence, which, when viewed as a whole, could permit a reasonable jury to find that his race and/or sex, rather than his job performance, was the actual cause of his termination.  He contends that he had actually performed his job satisfactorily throughout his employment and that the thing that changed during his tenure with DCS was not the quality of his job performance, but the fact that Ms. Crum, who apparently harbored negative views towards him, became his supervisor, at which point he received from her his first "Needs Improvement" and "Does Not Meet expectations" ratings on an end-of-year appraisal. Mr. Galvan contends that, after he complained about these negative ratings, Ms. Crum

began issuing unwarranted discipline and directing his direct supervisor, Ms. Heman, to do the same, which eventually culminated in his termination.

After carefully reviewing the evidence before us, we find that, when viewed holistically and in the light most favorable to Mr. Galvan, as we are required to do at the summary judgment stage, it is insufficient to establish a nexus between Defendants' disciplinary and termination decisions and Mr. Galvan's race or sex such that no reasonable jury could find that his termination was the result of unlawful discrimination.

In support of his interpretation of the evidence, Mr. Galvan relies heavily on the fact that he had previously always received "Meets" or "Exceeds" expectations ratings on his reviews before Ms. Crum became his supervisor.  While it is true that prior to Ms. Crum becoming his supervisor Mr. Galvan had never received any performance rating below "Meets expectations" on any of his reviews, his prior satisfactory evaluations still included several areas in which it was noted that Mr. Galvan needed improvement, including his tendency to "show and state visible frustrations … in unprofessional ways," which is behavior similar to that for which he was later counseled or disciplined by Ms. Crum and Ms. Heman.[2]  And, while it may also be true, as Mr. Galvan agues, that in their briefing in support of their motion for summary judgment Defendants engaged in "cherry picking" to emphasize the least complimentary portions of his overall satisfactory

---

[2] For example, Mr. Galvan was informally counseled and/or formally disciplined for several incidents in which he was alleged to have expressed his frustrations in inappropriate ways, including by speaking so harshly to a coworker as to cause her to cry, saying that a subordinate had been "babied" by her previous supervisor and that he was not going to "baby" her, and shouting so loudly at Ms. Nigg, a trainee, that he was heard through the phone in another room of the client's house.

reviews prior to Ms. Crum becoming his supervisor, the fact remains that concerns similar to those raised by Ms. Crum in Mr. Galvan's 2017 end-of-year review and her subsequent discipline of him had been included in prior job performance appraisals. That pattern demonstrates that the concerns regarding Mr. Galvan's supervisory style and demeanor identified by Ms. Crum were not new concerns, in fact, they had been raised by other of Mr. Galvan's prior supervisors, none of whom does he allege harbored discriminatory animus toward him.

We concede that "[w]here an employer's reason for a[n adverse action] is without factual basis or is completely unreasonable, that is evidence that an employer might be lying about its true motivation." *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 646 (7th Cir. 2013). However, the Court does not sit as a "super personnel review board that second-guesses an employer's facially legitimate business decisions." *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008) (quotation marks omitted). Here, Mr. Galvan has failed to point to any evidence beyond his personal belief that Defendants' assessments of his workplace behavior were mistaken, on the basis of which a jury could infer that he was disciplined and ultimately terminated because of his race and/or sex.

Significantly, Mr. Galvan does not dispute the pertinent facts underlying any of the incidents for which he was disciplined and eventually terminated. He merely argues that he was not to blame in any of these situations. For example, he concedes that he permitted one of the FCMs under his supervision to leave an assessment without preparing a child's safety plan, which was the justification for his March 2018 written counseling; that on another occasion he "unsubstantiated" domestic violence allegations,

for which he was disciplined in September 2018; and finally that, while under his temporary supervision, Ms. Nigg failed to complete for his review a safety plan for a minor who had witnessed her parents using drugs. The fact that Defendants determined—contrary to Mr. Galvan's view—that he exhibited poor judgment and failed to provide sufficient supervisory support to his subordinates in these situations, initially justifying discipline and eventually his termination based on his supervision of Ms. Nigg, without some evidence from which a reasonable jury could infer that Defendants' proffered nondiscriminatory reasons for these employment decisions are unworthy of credence, leaves him without support for his discriminatory discharge claim. *Lauth v. Covance*, 863 F.3d 708, 715–16 (7th Cir. 2017) ("[Plaintiff's] belief that he was performing his job adequately is not relevant to the question of whether [the defendant] believed it has a legitimate, non-discriminatory basis to terminate him.").

Mr. Galvan answers that he has, indeed, provided such evidence, highlighting as examples of Ms. Crum's discriminatory animus the fact that she prohibited him from attending Hispanic outreach meetings as the sole DCS representative, instead requiring Ms. Heman, a white woman, to attend with him, and that she ignored complaints of discrimination he had made to her in August 2018, a few months before his termination. He cites as further proof Defendants' records listing Mr. Galvan and another Hispanic male supervisor, Zachary Coffman, as the only Madison County employees to have received discipline. In addition, he proffers as further evidence of discrimination his personal observations that unidentified white, female supervisors routinely escaped discipline for various job related infractions. He also claims that he was treated less

favorably than several similarly situated white, female individuals, including Ms. Crum, Ms. Heman, Ms. Nigg, as well as Spencer Osborne, a white male caseworker in the Madison County office, whom DCS retained despite escalating behavior involving child safety and terminated only after he was criminally charged in an incident of child endangerment.  Contrary to Mr. Galvan's contentions, the evidence he has adduced, even when viewed as a whole and in the light most favorable to him, is insufficient to cast doubt on Defendants' proffered nondiscriminatory reason(s) for his termination.

We begin with an analysis of Ms. Crum's remark that, if Mr. Galvan wanted to represent DCS at the Hispanic outreach meetings, Ms. Heman had to attend with him. This statement is far too ambiguous to raise an inference of racial or sex discrimination. Additionally, it was made long before Mr. Galvan's termination and was entirely unrelated to any adverse employment decision, never mind his termination.  *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866 (7th Cir. 2016) ("Remarks can raise an inference of discrimination when they are (1) made by the decision-maker, (2) around the time of the decision, and (3) in reference to the adverse employment action.") (quotation marks and citation omitted).

Likewise, the fact that Mr. Galvan and another Hispanic male, Mr. Coffman, were the only two supervisors disciplined in Madison County, unsupported by some evidence that the discipline was pretextual or that similarly situated individuals were treated less favorably does not prove discrimination against either or both men.  Mr. Galvan lacks sufficient details surrounding the circumstances of the incident that resulted in Mr.

Coffman's discipline for us to determine whether valid comparators exist or to make any assessment regarding the legitimacy of the discipline he received.

Moreover, although Mr. Galvan claims to have identified several similarly-situated comparators to himself, none of those individuals is in fact actually similar and thus their treatment does not and cannot support an inference of discrimination. Ms. Crum and Ms. Heman are not valid comparators as they were both Mr. Galvan's supervisors, and neither is alleged to have committed the same or similar violation of DCS policy for which Mr. Galvan was terminated, to wit, failing to ensure the safety of a child by failing to provide adequate supervisory support. The Seventh Circuit has often recognized that "supervisors usually make poor comparators for plaintiffs claiming employment discrimination." *Rodgers v. White*, 657 F.3d 511, 517-18 (7th Cir. 2011). The cases cited by Mr. Galvan in which supervisors were used as valid comparators are distinguishable to the case before us because in those cases, unlike here, the supervisor was alleged to have engaged in the same conduct for which the plaintiff was disciplined or terminated. *See Baker v. Macon Res., Inc.*, 750 F.3d 674 (7th Cir. 2014); *Prather v. Midcontinent Independent Sys. Operator, Inc.*, 2021 WL 1144580 (S.D. Ind. 2021).

For similar reasons, Ms. Nigg is also not a valid comparator for Mr. Galvan as she was his subordinate and at the time of the incident in October 2018 much less experienced than Mr. Galvan as she had only recently begun working for DCS. Accordingly, the fact that she did not receive discipline for her failure to complete a safety plan (a much different policy violation than that for which Mr. Galvan was terminated), is not probative of discrimination.

Nor is Mr. Osborne a useful comparator here because, although he worked in the Madison County office, he held a different job than Mr. Galvan and was not a supervisor; therefore, his conduct did not violate DCS policy as a result of supervisory decisions he made.  Mr. Galvan puts forth a conclusory argument that because Mr. Osborne's supervisors were not disciplined or terminated for their failure(s) to adequately supervise Mr. Osborne, they were also treated more favorably.  But Mr. Galvan has entirely failed to identify those supervisors by name or to provide evidence of their race, sex, work history, performance reviews, supervisors, or qualifications to enable us to "eliminate other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable— discriminatory animus."  *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012); *accord McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 369 (7th Cir. 2019) (holding that conclusory statement by plaintiff that there existed evidence that similarly situated employees were treated more favorably without supplying employees' names, work history, performance reviews, or information regarding the protected characteristic was insufficient to raise genuine issue of material fact); *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 723 (7th Cir. 2018) (holding that a table listing the names, ages, and positions of 37 employees did not amount to enough "amplifying detail of the employees' qualifications or employment history that would allow this Court to comfortably conclude [the adverse employment action] was the result of discriminatory motive rather than some other explanatory variable").

Accordingly, we are left only with Mr. Galvan's claim that Ms. Crum and Ms. Heman failed to address his complaints of discrimination voiced a few months before he was terminated as evidence that his termination was based on his race and/or sex and not on his performance deficiencies as identified by Defendants.  It is true that the Seventh Circuit has "said that a supervisor standing by while an employee complained about race discrimination could be evidence of discriminatory animus." *Tank v. T-Mobile USA, Inc.*, 758 F.3d 800, 809 (7th Cir. 2014).  But the single reference to a complaint by Mr. Galvan remote in time from, and otherwise unconnected to the termination decision, would not allow a reasonable jury to conclude that Mr. Galvan's race and/or sex was the reason he was let go, particularly when considered against the undisputed facts regarding Mr. Galvan's conduct and the dearth of evidence otherwise pointing to a discriminatory motive.  For these reasons, Defendants are entitled to summary judgment in their favor on Mr. Galvan's discriminatory termination claim.

### ii.    Retaliatory Termination

Regarding Mr. Galvan's Title VII retaliatory termination claim, he argues that a reasonable jury could conclude, based on what he describes as a pattern of discipline by Defendants which occurred shortly after he had engaged in statutorily protected activity, namely, by complaining of race and sex discrimination, that his termination was in retaliation for those complaints.  The chronology of events establishes that Mr. Galvan's employment was terminated approximately two to three months following his most recent complaint of discrimination.  To survive summary judgment on this claim, Mr. Galvan must be able to establish that "he engaged in a protected activity; (2) he suffered

an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action." *Lauth v. Covance, Inc.*, 863 F.3d 708, 716 (2017).

"Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006). Here, Mr. Galvan's evidence falls short of making such a showing that the civil service complaint he filed following his 2017 end-of-year review was protected activity. The only testimony in the record regarding the specifics of his complaint is Mr. Galvan's testimony that he believed and informed his supervisors of his belief that he was being treated "differently" than other employees. That single word—"differently"—is insufficient to establish the required connection to his being in a protected class or that he engaged in protected activity. The fact that Mr. Galvan was formally disciplined a few weeks after filing his civil service complaint is therefore not evidence supporting Mr. Galvan's contention that Defendants engaged in a pattern of retaliatory discipline without some evidence that he had first engaged in protected activity under Title VII.

Mr. Galvan also contends that he complained to Ms. Crum and Ms. Heman sometime "in mid-2018" or in "July or August of 2018" that he felt he was being treated differently "because [he is] Mexican" and "a big guy, scary looking, according to people." Galvan Dep. at 199, 200; *accord* Galvan Aff. ¶ 205. Unlike his civil service complaint, this complaint is sufficient to constitute protected activity. But Mr. Galvan's retaliatory termination claim fails because he has failed to adduce evidence from which a jury could infer a causal link between those complaints and his termination. He

maintains that he has proffered evidence to establish a history of being disciplined shortly after complaining about discrimination, thus supporting an inference that his termination, which occurred a few months after he engaged in statutorily protected activity, was in retaliation for his having complained of discrimination.  As we have discussed, Mr. Galvan has failed to establish that his civil service complaint constituted protected activity to support his contention that there exists a pattern of discipline closely following protected activity.

The fact that Mr. Galvan was terminated approximately three to four months following his mid-summer 2018 complaints of discrimination, even crediting his testimony that, to his knowledge, those complaints were not investigated, is simply not enough, without some evidence that connects his termination to those discrimination complaints, to raise an inference of retaliation.  *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008) ("On summary judgment, in particular, 'it is clear mere temporal proximity is not enough to establish a genuine issue of material fact.'") (quoting *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004)); *see also Benuzzi v. Bd. of Educ. of City of Chi.*, 647 F.3d 652, 666 (7th Cir. 2011) (holding that a two-month time frame separating the plaintiff's EEOC complaint and her suspension was insufficient to support an inference of retaliation); *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) ("The approximate seven-week interval between [plaintiff's] sexual harassment complaint and her subsequent arrest/termination does not represent that rare case where suspicious timing, without more, will carry the day.").

Accordingly, Defendants are entitled to summary judgment on Mr. Galvan's retaliatory termination claim.

### ii.     Discriminatory/Retaliatory Failure to Transfer

Defendants also seek summary judgment on Mr. Galvan's Title VII discrimination and retaliation claims based on his failure to be transferred to Hamilton County due to lack of evidence giving rise to an inference that his failure to be transferred was motivated by unlawful race or sex discrimination or retaliatory animus.  According to Defendants, the evidence establishes that each of the four individuals selected for the Hamilton County positions as opposed to Mr. Galvan were the most qualified candidates.[3]  Mr. Galvan rejoins that he was clearly better qualified than each of the selectees and that a reasonable jury therefore could, in analyzing the evidence as a whole, conclude that Defendants' rationale is unworthy of belief and raises an inference of a discriminatory or retaliatory motive.

---

[3] We note that it is not clear from the record the extent to which either Ms. Heman or Ms. Crum, the only two individuals Mr. Galvan has alleged in this litigation to have had any discriminatory or retaliatory animus, were ultimately personally involved in the transfer decisions.  It is undisputed that Hamilton County's Local Office Director, Ms. Beebe, interviewed the candidates for each transfer.  Ms. Heman is alleged to have also been present for some but not all the interviews, though it is not clear the extent to which she actively participated in the interviews she attended or in the decisionmaking process that followed.  Additionally, while Ms. Crum is alleged by Mr. Galvan to have had final approval power over transfers within Region 11, the evidence does not show that she was present at or involved in his interviews for any of the Hamilton County positions nor is it clear the extent to which she was involved in some other way in making any selection decisions in the first instance.  However, Defendants have left these issues entirely undeveloped in their motion for summary judgment.  If Ms. Heman or Ms. Crum were not decisionmakers with regard to the transfer selections, Plaintiff's claim is even less promising.

In failure to promote or failure to hire cases, the Seventh Circuit has held that where, as here, the employer's proffered non-discriminatory reason for its employment decision "is that it selected the most qualified candidate, evidence of the applicants' competing qualifications does not constitute evidence of pretext unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue." *Mlynczak v. Bodman*, 442 F.3d 1050, 1059 (7th Cir. 2006) (quoting *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1180 (7th Cir. 2002)).  It is undisputed that Ms. Albee, who was chosen over Mr. Galvan for the first Hamilton County opening, had worked for DCS longer than Mr. Galvan and had an additional year of supervisory experience.  The individuals selected for the second and third positions, Mr. Despain and Ms. Hickerson, although not supervisors, had also each worked for DCS in the Hamilton County office longer than Mr. Galvan and were therefore in Defendants' view more experienced than Plaintiff.  Defendants also point out that Mr. Galvan has adduced no evidence to show that the person selected for the fourth transfer position, Ms. Tinker, had a history of disciplinary infractions as extensive as Mr. Galvan's.  Accordingly, Defendants argue that they are entitled to summary judgment because Mr. Galvan cannot show that he was so obviously superior to any of these four candidates that there could be "*no dispute* among reasonable persons of impartial judgment that [he] was clearly better qualified." *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 381 (7th Cir. 2020) (emphasis in original).

Mr. Galvan disagrees with Defendants' assessment of the other candidates' qualifications.  Mr. Galvan argues that he was better qualified than Ms. Albee because, unlike her, he had previously worked in Hamilton County and therefore had more relevant work experience, and, having worked in Hamilton County, he knew that, based on Ms. Albee's personality, she would struggle there, a fact he says that was confirmed when she resigned a few months after she was chosen to fill the position.  But an employee's "own opinions about [his] … qualifications [do not] give rise to a material factual dispute."  *Id.* (quoting *Rabinovitz v. Pena*, 89 F.3d 482, 487 (7th Cir. 1996). While Mr. Galvan may personally believe that his previous experience working in Hamilton County was more relevant and valuable than Ms. Albee's additional year as a DCS supervisor, it is not such a markedly superior qualification that no reasonable person could believe otherwise.  Mr. Galvan has pointed to no other "weaknesses, implausibilities, inconsistencies, or contradictions" in the State's stated reason for selecting Ms. Albee for the Hamilton County position over him "that a reasonable person could find [it] unworthy of credence."  *Harper v. C.R. England, Inc.*, 687 F.3d 297, 311 (7th Cir. 2012).  Under such circumstances, an employer is permitted to "make a calculated business decision by weighing the relative merits and deficiencies of [the] candidates," *Dunn v. Nordstrom, Inc.*, 260 F.3d 778, 787 (7th Cir. 2001), and the court "must respect the employer's unfettered discretion to choose among qualified candidates." *Millbrook*, 280 F.3d at 1181.  For these reasons, Mr. Galvan's Title VII claims based on his failure to be selected to fill the first Hamilton County position cannot survive summary judgment.

Mr. Galvan maintains that he was also better qualified than Mr. Despain because, although Mr. Despain had been hired before Mr. Galvan and had worked his entire tenure in Hamilton County, Mr. Despain had no supervisory experience, and further that Mr. Galvan knew him to be disorganized and not a person that co-workers consulted for guidance. Mr. Galvan points to the fact that Mr. Despain, like Ms. Albee, left the position shortly after being selected as additional supportive evidence showing that he was a poor choice for the supervisory role. However, Mr. Galvan has put forth no evidence that would cast suspicion on the State's proffered reason for choosing Mr. Despain for the second transfer position beyond his own personal view that his supervisory experience outside Hamilton County was preferable to Mr. Despain's more extensive experience working within Hamilton County, in a non-supervisory role.[4] Because reasonable minds could differ regarding which man's qualifications were superior, Mr. Galvan's contention that he was better qualified, standing alone, "cannot carry the day for [him]." *Robertson*, 949 F.3d at 381. Defendants are therefore entitled to summary judgment on Mr. Galvan's Title VII claims related to the second transfer position.

At the time Ms. Hickerson was promoted to fill the third transfer position, she was already working in the Hamilton County office and had a slightly longer overall tenure with DCS than Mr. Galvan, although not in a supervisory role. Mr. Galvan argues that

---

[4] Although Mr. Galvan's "Needs Improvement" appraisal was dated prior to Mr. Despain's hiring, no evidence has been adduced to establish that the appraisal was relied upon in selecting Mr. Despain over Mr. Galvan for the Hamilton County position.

the fact that Ms. Hickerson had no supervisory experience, coupled with his belief that she had a poor attitude, rendered her less qualified than him.  But as with Mr. Despain, we cannot say that Mr. Galvan's supervisory experience rendered him so clearly better qualified than Ms. Hickerson, who had a longer tenure both with DCS overall and in the Hamilton County office in particular, that no reasonable person could disagree that his qualifications were superior.  Thus, Mr. Galvan's qualifications alone do not cast doubt on the State's proffered reason for hiring Ms. Hickerson.  *Millbrook*, 280 F.3d at 1180.

In addition to what he contends are his superior qualifications, Mr. Galvan also points to the fact that Defendants cited his "Needs Improvement" review and the written counseling he was issued for allowing an FCM under his supervision to leave an assessment without completing a safety plan as further justification for Ms. Hickerson's selection over him.  Mr. Galvan argues that neither the poor review nor the counseling was justified and that they were instead based on discriminatory and/or retaliatory animus on Ms. Crum's part, thereby tainting the decision-making selection process for the third Hamilton County position.  However, Mr. Galvan does not dispute that DCS had in fact received the two complaints regarding his conduct that are cited in his 2017 end-of-year appraisal as justification for his "Needs Improvement" rating nor does he deny that he had permitted an FCM under his supervision to wait until the day after an assessment to complete a safety plan, which was the conduct for which he was counseled.  Mr. Galvan vaguely argues that other supervisors who do not share his protected characteristics were not disciplined for failing to require completion of safety plans, but he cites no specific examples of such disparate treatment.  Given these concessions, viewing the evidence

holistically, we find that Mr. Galvan has failed to raise a material issue of fact as to whether the State's reason for not selecting him for the third transfer position is pretext for discrimination or retaliation. *See Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 640-41 (7th Cir. 2008) ("A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exist to permit a jury to return a verdict for that party.") (quotation marks and citation omitted). Defendants are therefore entitled to summary judgment on Mr. Galvan's Title VII discrimination and retaliation claims based on his failure to be selected for the third Hamilton County position.

With regard to the fourth Hamilton County position, Mr. Galvan claims that he was clearly more qualified than the woman selected for the position, Ms. Tinker, because she was hired several years after him and had no supervisory experience or experience working in the Hamilton County office. Defendants rejoin that Ms. Tinker was in fact more qualified than Mr. Galvan because she did not have a similar disciplinary record. Mr. Galvan does not dispute this difference, but again claims that any reliance on his disciplinary record in deciding not to select him for the position is problematic because the discipline he received was unwarranted and had been issued for discriminatory and retaliatory reasons. However, because Mr. Galvan has failed to establish (for the reasons detailed above) that the discipline he received was motivated by discriminatory and/or retaliatory animus, it was within DCS's discretion to determine that his disciplinary record rendered him less qualified than Ms. Tinker for the job. Mr. Galvan has presented no other evidence that would support an inference that Defendants' proffered reason for Ms. Tinker's selection was merely pretextual for an unlawful motive. Defendants are

therefore entitled to summary judgment on Mr. Galvan's Title VII discrimination and retaliation claims based on his failure to be selected for the fourth Hamilton County positions.

### B.    Fourteenth Amendment Due Process

Defendants have requested summary judgment in their favor on "all claims," but omitted from their briefing any mention of Mr. Galvan's Fourteenth Amendment due process claim, much less any theories that would defeat that claim.  Plaintiff's briefing was similarly lacking.  Therefore, lacking such arguments, summary judgment is unavailable on this claim.

## III.    Conclusion

For the reasons detailed above, Defendants' Motion for Summary Judgment [Dkt. 57] is <u>DENIED</u> as to Plaintiff's Fourteenth Amendment claim against Defendant Crum and <u>GRANTED</u> as to all other claims.

IT IS SO ORDERED.

Date:  _____1/5/2022_____

_Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Richard L. Darst
COHEN GARELICK & GLAZIER
rdarst@cgglawfirm.com

Thomas Joseph Flynn
INDIANA ATTORNEY GENERAL
tom.flynn@atg.in.gov

Winston Lin
INDIANA ATTORNEY GENERAL
winston.lin@atg.in.gov

Patrick Ellery MacDonell
INDIANA ATTORNEY GENERAL
Patrick.Macdonell@atg.in.gov