UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| RENE GALVAN, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-04446-SEB-MG |
| | ) | |
| STATE OF INDIANA, | ) | |
| JOANIE R. CRUM Regional Manager, in her | ) | |
| official and individual capacities, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendants' Motion for Summary Judgment [Dkt. 108]. Plaintiff Rene Galvan, Jr. initiated this action against his former employer Defendant State of Indiana (the "State") and his supervisor Defendant Joanie R. Crum, in her official and individual capacities, alleging that he was discriminated against and terminated based on his race (Hispanic) and sex (male), and subjected to retaliation based on his complaints of discrimination, all in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), and that Ms. Crum denied his Fourteenth Amendment rights by terminating him without just cause and depriving him of his property rights without due process, in violation of 42 U.S.C. § 1983.

We previously granted summary judgment in Defendants' favor as to the Title VII claims in our January 5, 2022 Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment [Dkt. 93] but denied Defendants' request for summary judgment as to Plaintiff's Fourteenth Amendment due process claim due because

Defendants failed to brief the issue.  Defendants were subsequently granted leave to file a

second motion for summary judgment addressing only Plaintiff's due process claim,

which motion they filed on February 2, 2022 [Dkt. 108].  For the reasons detailed below,

Defendants' motion for summary judgment as to Plaintiff's due process claim is

<u>GRANTED</u>.

## **Factual Background**[1]

### **General Background**

Mr. Galvan was hired in late 2012 by the State's Department of Child Services

("DCS") as a Family Case Manager ("FCM") based in the Hamilton County office. As an

FCM, Mr. Galvan was responsible for managing the cases he was assigned but had no

departmental supervisory responsibilities. In 2015, at the request of a supervisor, Mr.

Galvan voluntarily transferred to DCS's larger Madison County office where he was later

promoted to Family Case Manager Supervisor ("FCMS"). As an FCMS, Mr. Galvan was

responsible for supervising a team of FCMs. He himself was directly supervised in that

role by the Local Office Director ("LOD") of Madison County, who, in turn, was

supervised by the Regional Manager of Region 11, which territory includes Hamilton,

Madison, Tipton, and Hancock Counties.

From 2012-2016, Mr. Galvan was supervised by Dan Brumfield, who served as

the Regional Manager of Region 11. Under Mr. Brumfield's supervision, Mr. Galvan

---

[1] We have drawn heavily from the factual recitation set forth in our prior order addressing the
Defendant's first motion for summary judgment and have supplemented those facts only to the
extent relevant to address the issue now before us. *See Galvan v. Indiana*, No. 1:19-cv-04446-
SEB-MG, 2022 WL 44650 (S.D. Ind. Jan. 5, 2022).

received performance evaluations which reflected he "meets" or "exceeds" expectations in every assessed category. At the end of 2016, Mr. Brumfield left State employment for other employment. DCS did not replace him until April 2017, when Defendant Joannie Crum, who at the time was serving as the Local Office Director for Montgomery County, was promoted to the Regional Manager position.

In July 2017, shortly after Ms. Crum took over as Regional Manager, Madison County's LOD Karen Blessinger, who had been Mr. Galvan's direct supervisor, left the Madison office. Following Mr. Blessinger's departure, the Hamilton County and Tipton County LODs, Christi Tucker-Beebe and Lyndsay Krauter, respectively, at Ms. Crum's request, performed the duties of the Madison County LOD in addition to their regular duties. Both LODs shared those duties until Ms. Crum promoted Kathryn Heman, a peer of Mr. Galvan's, to the full-time Madison County LOD role in December 2017.

**Plaintiff's Alleged Performance Issues and Subsequent Interactions with Ms. Crum in 2017**

During the latter half of 2017, Mr. Galvan had several interactions with Ms. Crum during which she conveyed her concerns about his behavior. On one occasion, Mr. Galvan reportedly had attended a community stakeholder meeting as a representative of DCS to request clarification of a report that was required regarding suspected drug use in a family. Following the meeting, Ms. Crum approached Mr. Galvan to convey a concern expressed by the central DCS office and to advise him to consult her in the future before making a public inquiry regarding such a sensitive issue, no formal discipline was issued regarding that matter. Another interaction occurred in the fall of 2017, when Ms. Crum

3

spoke with Mr. Galvan after receiving a report that he had caused another employee to cry when she called the DCS hotline after midnight to make a report of suspected child abuse and neglect. After Ms. Crum learned of the incident, she contacted Mr. Galvan who explained his side of the encounter. Based on Mr. Galvan's description of the incident, Ms. Crum agreed that the caller had violated DCS policy by calling in so late in the night to make a report when it was not an emergency. Galvan Aff. ¶ 119. Because he was never disciplined for this incident, he believed the situation had been resolved. *Id.* ¶ 121; Galvan Dep. At 44–45.

On his 2017 end-of-year performance appraisal report, Mr. Galvan for the first time received a "Needs Improvement" overall rating as well as a "Does Not Meet" expectations rating in the categories of "Customer Service" and "Employee Relations." The report noted that DCS had received complaints during the review period regarding Mr. Galvan's behavior from "both internal and external stakeholders," including "display[ing] inappropriate responses when directing a subordinate" by "verbaliz[ing] publicly his frustration with a staff member." Exh. H to Galvan Dep. at 2. With regard to "Employee Relations," the report concluded that Mr. Galvan "was ineffective in establishing and maintaining a cordial and harmonious work environment at times," "displayed difficulty communicating with peers, subordinates and managers," and was "verbally aggressive." *Id.* at 4.

This appraisal was presented to Mr. Galvan in February 2018 and signed by Ms. Crum as the evaluator. Mr. Galvan, however, refused to sign the evaluation form because he disagreed with the assessment and believed it was against DCS policy to give a

"Needs Improvement" rating when the employee had never been disciplined. Despite the rating, Ms. Crum informed her supervisor, Deputy Director Gilbert Smith, to whom Ms. Crum had sent an initial draft, that the appraisal report was "behavioral" and did "not warrant a WIP or plan," but that, if he thought otherwise, she was open to his suggestion. Dkt. 74-5.

**Plaintiff Receives Written Counseling**

On March 12, 2018, Mr. Galvan received a written counseling citation for having failed to ensure that an FCM under his supervision had completed a timely safety plan for a child within the department's system. Exh. J to Galvan Dep. Mr. Galvan had authorized the FCM in question "not to complete a safety plan with the family as the worker was tired and had been out for a long time" and the FCM thereafter neglected to remember to write a safety plan until after she and the family members had all left the hospital in the middle of the night. Because it was the middle of the night and would therefore be difficult to locate the family, and because the FCM had assured Mr. Galvan that "the pediatricians had not expressed any concerns with the [infant's] injury and [the family's] explanation," *id.*, Mr. Galvan viewed as acceptable the decision to wait until the following morning to complete a safety plan. In addition, DCS did not at that time have any policy requiring safety plans or imposing a schedule for the completion of such plans. Galvan Aff. ¶¶ 166–67.

The written counseling citation issued by Mr. Galvan's supervisor does not square with what Mr. Galvan contends the FCM had told him that evening. According to the written counseling form, Mr. Galvan's direct supervisor, Ms. Heman, spoke with a

pediatrician at the hospital "who expressed imminent concerns in regards to the injury and explanation, and the lack of safety planning" and "explained the concern was expressed at the time of release." Exh. J to Galvan Dep. Mr. Galvan was therefore counseled to "review Chapter 4 in policy . . . and implement a process to ensure assessments are thoroughly initiated and children are safe before the FCM leaves the assessment location." *Id.* Mr. Galvan has testified that at the time he received this discipline he was informed that DCS policy was changing such that the following week safety plans would be mandatory each time DCS became involved in a case, but Ms. Heman could not explain the reason he was being disciplined before the policy change was implemented. This is the first written counseling Mr. Galvan received during his tenure with DCS. Galvan Dep. at 88.

Despite the citation, Mr. Galvan's August 31, 2018 interim performance appraisal report, prepared by Ms. Heman, included all "Meets" expectations ratings. Specifically, in the "Customer Service" section of the report, it states that while Mr. Galvan "previously had difficulty with customer service in the past," over the current reporting period he succeeded in taking "advice on customer service to not come across as aggressive or demanding in oral or written conversation" and "promptly address[ing] [] issue[s], whether it be with a worker or a peer on the management team." Exh. I at 2.

In the "Employee Relations" section, Ms. Heman wrote that Mr. Galvan "is very supportive with his unit" and "takes time to get to know his unit through team activities and planned unit activities outside of the office." *Id.* at 3. She further noted that Mr. Galvan "treats everyone in the office equally and fairly and does not show favoritism"

and "[i]f any issue arises between him and another worker, [he] is quick to address the issue so that it does not linger." *Id.*

**Plaintiff's September 2018 Written Reprimand**

Approximately one month later, on September 26, 2018, Mr. Galvan received a written reprimand for directing an FCM under his supervision to "unsubstantiate" domestic violence allegations in connection with an incident that occurred on September 18, 2018. Exh. K to Galvan Dep. Following a review conducted by another FCMS, DCS determined that it was necessary to remove the children form the home because there was a child under the age of eighteen months in the home. The reprimand recited that "Mr. Galvan's judgment with regards to child safety is concerning" and that he "failed to use critical thinking and good judgment when guiding the FCM through the assessment regarding the safety of the children." *Id.*

In addition, the written reprimand referenced other concerns brought to the attention of the Local Office Director that Mr. Galvan "used negative statements towards staff" and "failed to address concerns of an FCM's work in a professional manner" by addressing the concerns of one of his FCMs "in a group, rather than in a 1:1 setting." *Id.* When questioned about this complaint, Mr. Galvan "admitted he did not have time to 'baby' staff and it seemed they had been 'babied' by their supervisor." *Id.*

**October 2018 Complaint from Subordinate**

On October 30, 2018, Kristin Nigg, an FCM whom Mr. Galvan had been supervising on a temporary basis, complained to Ms. Heman via email[2] about his supervision, stating that, at a unit breakfast on October 19, 2018, which she attended with Mr. Galvan's team, she was made to feel "very uncomfortable" because the meeting "entailed making fun of coworkers in which [she] did not want to take part." Exh. L to Galvan Dep.

In that same email, Ms. Nigg also complained regarding an incident that occurred on October 25, 2018 when she felt she did not receive adequate support from Mr. Galvan after she called him for advice while completing a placement in the field. Ms. Nigg reported that even though Mr. Galvan was still in the office at the time she called, he failed to assist her and instead told her that they would discuss the issue the following day. According to Ms. Nigg, after expressing concern on the following day regarding having to wait to receive advice, Mr. Galvan responded that she "was stressed" and "was relaying to him that [she] would not be able to handle things after 4:30 and [her] assessments or detentions would start going to on-call." *Id.*

The email recounted a third incident as well: on October 29, 2018, Ms. Nigg and a colleague, Elise Wilson, were conducting an assessment at a residence which necessitated

---

[2] Although in his deposition Mr. Galvan acknowledged previously having seen Ms. Nigg's complaint, when it was first shown to him is not indicated in the record. Neither party has informed us whether the email was presented to Mr. Galvan during the pre-deprivation hearing or at any time before his termination. When asked at his deposition if he knew of the complaint, Mr. Galvan affirmed as follows: "Yes, I was aware of [Ms. Nigg's] complaint after I was terminated." Galvan Dep. 166.

Ms. Nigg's stepping away to call Mr. Galvan, thereby leaving Ms. Wilson alone in the room with the clients. According to Ms. Nigg's email, Mr. Galvan criticized her so loudly for having a discussion with him in front of the clients that Ms. Wilson could hear his voice through the phone while in the other room. When Ms. Nigg tried to explain that she was not calling him while in the presence of the clients, she "was dismissed by [Mr. Galvan] and he was adamant [she] was in front of the family." *Id.*

Mr. Galvan testifies that he did not know anything was wrong until October 30, when he received a text from Ms. Heman which said he was no longer responsible for supervising Ms. Nigg. When Mr. Galvan inquired as to the reasoning, Ms. Heman only responded that they would discuss it later. Galvan Dep. 155.

According to Mr. Galvan's deposition testimony, Ms. Heman did not approach him about Ms. Nigg until November 2, 2018, when she met with him to discuss "Ms. Nigg's incident" when "Ms. Nigg said [Galvan] yelled at her and that [he] didn't support her." *Id.* at 156.[3] During that discussion, Mr. Galvan was allowed to explain his side of the events, which he testified he did in full. After doing so, Ms. Heman asked him about a safety plan from the October 25 incident, which they both agreed was deficient, and which, according to Mr. Galvan, did not appear to have been prepared by Ms. Nigg, based on the handwriting.[4] This was the final conversation Mr. Galvan had with Ms.

---

[3] It is unclear from the record whether Mr. Galvan's November 2 discussion with Ms. Heman included discussion of the events that had occurred on October 19, or if it was limited to the October 25 and October 29 incidents.

[4] We understand this to have been the first opportunity Mr. Galvan had to review this safety plan; earlier in his deposition he testified that, despite asking multiple times for Ms. Nigg's safety plan, he never received one. Galvan Dep. 148. Additionally, he testified that he did not present

Heman, given that shortly thereafter Ms. Crum announced Ms. Heman's immediate resignation on November 5.

**DCS's Decision to Remove Children from Home Reversed by Court**

As mentioned previously, in September 2018 DCS reversed Mr. Galvan's "unsubstantiated" finding, and directed the removal of the client children from their family following an alleged domestic violence incident. The family of the children whom DCS had removed subsequently appealed that decision to state court. Mr. Galvan states that the presiding state court judge ordered DCS to close the case after determining in November 2018, in a decision in line with Mr. Galvan's initial recommendation, that the children should not have been removed from the home. Defendants have not claimed otherwise.

On November 8, 2018, upon learning of this judicial determination, Mr. Galvan approached Ms. Crum to request that the reprimand he had previously received regarding this incident be removed from his record, since the judge's decision agreed with his original assessment. Mr. Galvan informed Ms. Crum that he had been told by the FCM who had been assigned to the case that Ms. Heman and another FCMS had caused the FCM to falsify the report to say that a child under eighteen months was present during the September 2018 assessment, which was not true, in order to raise the risk level. Ms. Crum responded to Mr. Galvan that they would discuss these issues later, informing Mr. Galvan for the first time that she needed to meet with him later that same day for a pre-

---

any documents as evidence at his pre-deprivation hearing "because Ms. Nigg never provided any documents to me." *Id.* at 172.

deprivation hearing to discuss "Ms. Nigg and what happened with her a couple weeks ago" and that he needed to find a witness to attend the upcoming session with him. Galvan Dep. at 170.

**Plaintiff's Pre-Deprivation Hearing and Termination**

Because he had never previously participated in a pre-deprivation hearing, Mr. Galvan was not sure what it entailed, believing his supervisors "were finding facts and they were going to determine if someone was going to get disciplined, like either termination or days without pay or things of that nature." *Id.* at 171.  Mr. Galvan asked Zachary Coffman, another supervisor in the Madison County office, to serve as his witness.  Mr. Galvan, Mr. Coffman, and Ms. Crum were all present at the hearing, as well as the interim LOD, Ms. Crumbaugh.

Mr. Galvan spoke on his own behalf at the hearing and explained his version of his interactions with Ms. Nigg: to wit, that he had provided her adequate support by sending more experienced FCMs to accompany and assist her on her detentions and assessments and that, despite making several requests, Ms. Nigg never completed the necessary paperwork or safety plans for the locations she visited, even though he had assigned other FCMs to help her complete the documents and he had repeatedly asked to see them. He stated that he was notified only after Ms. Nigg did not report to him for a few days that he would no longer be supervising her, but was provided no explanation for his removal. Galvan Aff. ¶ 302. Mr. Galvan also denied Ms. Nigg's allegation that he had yelled at her over the phone and explained that he had simply told Ms. Nigg not to call and speak with him in the presence of family. *Id.* ¶¶ 296–298. Mr. Galvan did not bring any witnesses to

testify to these events, though he claims he believed Ms. Crum and Ms. Crumbaugh had already interviewed others ahead of the hearing and thus it was unnecessary. Galvan Dep. 172. He explains that he brought no documents to the hearing because he never received any safety plans from Ms. Nigg, and he "just went off like [his] memory" when presenting his side. *Id.* After the hearing was completed, Mr. Galvan returned to his office as instructed.

Though Mr. Galvan stated in his deposition his having told only his side of the story during the pre-deprivation hearing, Ms. Crum testified that she expressed more specific concerns to him during the hearing, including "that he had not overseen the safety evaluation, the safety assessment or provid[ed] [Ms. Nigg] with appropriate guidance during her time at the hospital" on October 25. Crum Dep. 46. Ms. Crum also testified that she had discussed at the pre-deprivation hearing a second incident in which Mr. Galvan had "fail[ed] to provide direction to another FCM," though she does not specify the date of the second incident. *Id.* at 47. Specifically, Ms. Crum discussed with Mr. Galvan details of this incident, including that the FCM had prepared a deficient safety plan, which Mr. Galvan "agreed that he should have reviewed . . . [but] still believed that he provided support because he directed [the FCM] to do a safety plan." *Id.* At some point in the conversation they also discussed "safety staffing" and whether Mr. Galvan had "safety staffed" these cases.[5]

_____

[5] Neither party has addressed whether Mr. Galvan was told either prior to or during the pre-deprivation hearing the range of disciplinary actions to which he might be subject depending on the outcome of the hearing. Although we understand Mr. Galvan to have known generally that pre-deprivation hearings were precursors to more serious discipline, including termination, it

Following the meeting, Ms. Crum contacted her supervisor, Rhonda Allen, and a
human resources generalist to discuss these events. All three reviewed the materials
presented at the hearing before reconvening and providing their shared recommendation
for dismissal.[6] A few hours later, around 5:00 or 6:00 p.m., Ms. Crum and Ms.
Crumbaugh visited Mr. Galvan in his office to inform him that the decision had been
made to terminate him for the reasons set forth in the termination letter they delivered to
him. The termination letter stated that Mr. Galvan was being terminated because he had
failed to provide "appropriate supervision to an employee in the field nor did [he] provide
appropriate oversight and guidance around safety planning," and failed to "follow
procedure regarding safety staffing or review safety plans created by the FCM regarding
assessment." Dkt. 59-195. The letter also stated that such conduct violated the agency
code of conduct and agency policies 4.18, 4.19, and 4.41. *Id.* Upon receiving this letter,

---

appears, based on his deposition testimony, that Mr. Galvan did not understand his employment
was on the line until he was formally dismissed by Ms. Crum, within a few hours following the
pre-deprivation hearing.

[6] According to Ms. Crum, the recommendation for initiating a pre-deprivation hearing in Mr.
Galvan's case came from Ms. Heman before her departure. Defendants have attached to their
Reply a Disciplinary Justification Form dated November 1, 2018, which lists Mr. Galvan's
previous discipline, including the written reprimand he was issued on October 1 regarding
"unprofessional behavior/poor judgement [sic] regarding safety of children," as well as a
summary of the October 25 and 29 events with Ms. Nigg. Much of the form was left empty,
however, including the spaces provided for listing specific policies alleged to have been violated
by the employee's behavior.  In the space provided for listing previous instances of similar
discipline received by the employee, the form lists Mr. Galvan's October 1 Written Reprimand,
two instances of Written Counseling on June 26 and April 27, 2018, and the February 2018
Annual Performance Appraisal.  According to Mr. Galvan, he was never given a copy of this
document until six months into the discovery process relating to the instant litigation, obviously
well after his termination. Mr. Galvan further attests that the form incorrectly lists a June Written
Counseling citation which he never received.

Mr. Galvan packed up his office belongings and was asked to leave the premises. Galvan Dep. at 170.

### Post-Termination Evidentiary Hearing and the Instant Litigation

Following his termination, in accordance with his rights under Indiana Code § 4-15-2.2-42, Mr. Galvan filed an appeal with the Indiana State Employees' Appeals Commission ("SEAC"). On November 9, 2020, the SEAC held a full adversarial evidentiary hearing before Chief Administrative Law Judge ("ALJ") Gabriel Paul. Mr. Galvan was represented by his counsel, Mr. Richard Darst, and was able to call witnesses, testify on his own behalf, and discuss his performance evaluations with the ALJ.  Based on the arguments, witness testimony, admitted evidence, and applicable law, the ALJ found on January 28, 2021 that Mr. Galvan's termination of employment was for just cause.

Mr. Galvan filed this judicial action on November 4, 2019, having received from the EEOC his notice of right to sue letter on August 7, 2019. He amended his complaint on January 17, 2020, alleging discrimination and retaliation claims under Title VII as well as a Fourteenth Amendment due process claim against Ms. Crum. Summary judgment was granted in favor of the Defendants on the Title VII claims on January 5, 2022. Defendants moved for summary judgment on the remaining Fourteenth Amendment due process claim on February 2, 2022, which motion has been fully briefed and is now ripe for ruling.

## Legal Analysis

### I.       Summary Judgment Standard

Summary judgment is appropriate where there are no genuine disputes of material

fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a);

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A court must grant a motion for

summary judgment if it appears that no reasonable trier of fact could find in favor of the

nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). We neither weigh the evidence nor evaluate

the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences

flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*,

573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

### II.      Discussion

Plaintiff alleges that Defendant Crum, in her official and individual capacities,

violated the rights guaranteed to him by the Fourteenth Amendment to the United States

Constitution by terminating him, thereby depriving him of his property rights without just

cause and without proper due process.  Defendants have moved for summary judgment

on this claim on the following grounds: (1) Fourteenth Amendment substantive due

process protections are limited to violations of fundamental rights and employment-

related rights are not fundamental; (2) Mr. Galvan has failed to establish a property

interest in the position of public employment such that he would be entitled to procedural

due process protections under the Fourteenth Amendment; (3) Ms. Crum is not amenable

to suit in her official capacity under 42 U.S.C. § 1983 for monetary damages; (4) the

State of Indiana is immune from suit under the Eleventh Amendment to the United States Constitution; and (4) Ms. Crum is entitled to qualified immunity from suit.

Several of Defendants' arguments we can dispense with quickly.  Plaintiff has confirmed in his response brief in opposition to Defendants' summary judgment motion that he is not pursuing a substantive due process claim.  We therefore need not address Defendants' substantive due process arguments.  Nor need we address the issue of the State of Indiana's immunity or Ms. Crum's amenability to suit in her official capacity for monetary damages under § 1983, given that Plaintiff dropped his due process claim against the State and his request for monetary relief against Ms. Crum in her official capacity more than two years prior to the filing of the instant motion for summary judgment.[7]  Having resolved these issues, we proceed to the merits of Mr. Galvan's procedural due process claim against Ms. Crum.

To prove a violation of procedural due process under the Fourteenth Amendment, a plaintiff must show "(1) deprivation of a protected interest, and (2) insufficient procedural protections surrounding that deprivation." *Michalowicz v. Vill. of Bedford Park*, 528 F.3d 530, 534 (7th Cir. 2008).  It has long been established that a constitutionally protected property interests arises "[w]hen government gives its employees assurances of continued employment," and that a provision stating that employees may be terminated only for "just cause" constitutes such "an assurance of

---

[7] While we appreciate that Defendants' counsel has been substituted multiple times throughout this case, it is nevertheless the responsibility of all attorneys who file appearances to remain apprised of the history of the case when filing any motions with the Court.

continued employment." *Gorman v. Robinson*, 977 F.2d 350, 356, 357 (7th Cir. 1992).

Defendants concede that, as a classified employee, Mr. Galvan could be terminated only

for just cause. IND. CODE § 4-15-2.2-23(a) ("An employee in the state classified service

who has successfully completed a working test period may be dismissed, demoted, or

suspended, only for just cause ….").  Accordingly, contrary to Defendants' arguments

otherwise, Mr. Galvan had a protectible interest in his employment.  The only question

then is whether he received the procedural protections he was due prior to his

termination.

"The fundamental requirement of due process is the opportunity to be heard 'at a

meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333

(1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).  The right is "flexible,

requiring different procedural protections depending upon the situation at hand." *Doyle

v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 618 (7th Cir. 2002).  Where, as here, adequate

post-termination procedures exist,[8] "a pretermination hearing need only provide 'an initial

check against mistaken decisions—essentially, a determination of whether there are

reasonable grounds to believe that the charges against the employee are true and support

the proposed action." *Michalowicz*, 528 F.3d at 536–37 (quoting *Cleveland Bd. of Educ.

v. Loudermill*, 470 U.S. 532, 542 (1985)).  In this "truncated form, 'pretermination

process need only include oral or written notice of the charges, an explanation of the

---

[8] As discussed above, following his termination, Mr. Galvan filed an appeal with the SEAC in
accordance with his rights under Indiana Code § 4-15-2.2-42 and received a full adversarial
evidentiary hearing before an ALJ.  He has not challenged the adequacy of these post-
termination procedures.

employer's evidence, and an opportunity for the employee to tell his side of the story."
*Gilbert v. Homar*, 520 U.S. 924, 929 (1997) (citation omitted).

Here, the undisputed evidence establishes that Mr. Galvan was provided a few
hours' notice of his pre-deprivation hearing, which time period the Seventh Circuit has
recognized as sufficient to "permit the employee to gather his thoughts and his evidence
and to make an informed decision about the best way to respond …." *Staples v. City of
Milwaukee*, 142 F.3d 383, 386 (7th Cir. 1998).  Although Mr. Galvan was not made
aware in advance of specific policies he was alleged to have violated or to our knowledge
apprised of any actual evidence against him, the evidence before us makes clear that it
was Ms. Nigg's email complaint that formed the basis for Defendants' decision to
convene the pre-deprivation hearing and that Mr. Galvan was told prior to the hearing
that his interactions with Ms. Nigg were at issue.  Mr. Galvan further concedes that he
had an opportunity at the hearing to fully explain his version of events as related to Ms.
Nigg, which, based on our review, included a response to the topics addressed in her
email complaint against him.  Galvan Dep. at 169–72.  Mr. Galvan also testified that he
understood that the purpose of a pre-deprivation hearing was for "finding facts" and
"determin[ing] if someone was going to get disciplined, like either termination or days
without pay or things of that nature, like more serious discipline," such that he was on
notice of the seriousness of the hearing.  *Id.* at 171.

Following the hearing, Mr. Galvan was informed that he was being terminated for
failing to provide "appropriate supervision in the field" and "appropriate oversight and
guidance around safety planning," as well as "not follow[ing] procedure regarding safety

staffing or review[ing] safety plans created by the FCM regarding assessment." Dkt. 109-3 at 80. Although Mr. Galvan's termination letter does not identify the particular FCM being referenced, it is clear, based on the totality of the evidence in the record, that the reasons given for his termination were based on his alleged failure to adequately supervise Ms. Nigg. Mr. Galvan devotes much of his briefing in opposition to the instant motion arguing that his interactions with Ms. Nigg did not justify his termination, but the only issue before us is whether he was provided adequate procedural protections prior to his termination, not whether his termination was justified. As recounted above, Mr. Galvan was given sufficient notice of the pre-deprivation hearing, told that his interactions with Ms. Nigg were the subject of the hearing, had a full and fair opportunity to present his case, and was ultimately terminated based on his supervision of Ms. Nigg. These pre-termination proceedings made available to Mr. Galvan, while perhaps not as robust as could have been provided or as he would have liked, clearly comport with the limited due process standards applicable in this context.

But even if the pre-termination hearing Mr. Galvan received did not comport with due process, his claim still cannot survive summary judgment for another reason. Under the Indiana State Personnel Department Standardized Policy Statement on Discipline, dismissal of classified employees such as Mr. Galvan may be imposed "only after a predeprivation meeting has been held with the employee explaining the nature of the allegations and the evidence supporting the disciplinary action, and providing the employee an opportunity to explain his/her actions." Dkt. 116 at 31 (quoting Discipline Policy Statement (Aug. 1, 2021), *available at* https://www.in.gov/spd/files/discpol.pdf).

Mr. Galvan does not argue that these established State procedures themselves are inadequate, rather that Ms. Crum deprived him of these procedures by failing to provide him the proper notice he was owed under the State's departmental policies and rules.  In other words, he is claiming that the "random, unauthorized acts" of Ms. Crum deprived him of due process.  *See Leavell v. Ill. Dep't of Nat. Resources*, 600 F.3d 798, 804 (7th Cir. 2010) (distinguishing between claims that established state procedures do not comport with due process and claims of "random, unauthorized acts by state employees") (internal quotation marks and citation omitted).  When a plaintiff brings such a claim, he is required either to "avail [him]self of state post-deprivation remedies 'or demonstrate that the available remedies are inadequate.'"  *Id.* at 804–05 (quoting *Doherty v. City of Chicago*, 75 F.3d 318, 323 (7th Cir. 1996)).

As discussed above, Mr. Galvan availed himself of the State's post-deprivation remedies by appealing his termination decision and presenting his case at a full evidentiary and adversarial hearing conducted by an impartial ALJ, and he has not challenged the adequacy of those procedures in this lawsuit.  For all these reasons, Ms. Crum is entitled to summary judgment on Mr. Galvan's procedural due process claim.[9] *See id.* at 805 ("[W]hen the state conduct in question is random and unauthorized, the state satisfies procedural due process requirements so long as it provides [a] meaningful post-deprivation remedy.") (quoting *Rivera-Powell v. New York City Bd. of Elec.*, 470 F.3d 458, 465 (2d Cir. 2006).

---

[9] Because we hold that Mr. Galvan was not deprived of due process, we need not address Ms. Crum's qualified immunity defense.

III.    **Conclusion**

As detailed above, Defendants' Motion for Summary Judgment [Dkt. 108] is

<u>GRANTED</u>.  Final judgment shall issue accordingly.  All other currently pending

motions are denied as moot.

IT IS SO ORDERED.

Date:    7/20/2022

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Richard L. Darst
COHEN GARELICK & GLAZIER
rdarst@cgglawfirm.com

Ian Devereux
INDIANA ATTORNEY GENERAL
ian.devereux@atg.in.gov

W. Andrew Kirtley
INDIANA ATTORNEY GENERAL
andrew.kirtley@atg.in.gov

Winston Lin
INDIANA ATTORNEY GENERAL
winston.lin@atg.in.gov